**UNITED STATE DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**CENTRAL DIVISION AT LEXINGTON**
*(electronically filed)*

| | | |
|---|---|---|
| 2H&V CONSTRUCTION SERVICES, LLC | : | |
| | : | |
| Plaintiff, | : | |
| | : | Case No: 5:08-CV-388 |
| | : | |
| vs. | : | |
| | : | |
| SERGENT SYSTEMS, INC. ET AL., | : | |
| | : | |
| | : | |
| Defendants. | : | |

# MEMORANDUM OF LAW

Comes the Defendant, International Fidelity Insurance Company ("International"), and in support of its Motion to Dismiss Count IV of 2H&V Construction Services, LLC's ("2H&V") Complaint on the grounds that Count IV of the Complaint fails to state a claim upon which relief may be granted, states as follows:

## STATEMENT OF FACTS

On or about November 9th or November 16th, 2007, 2H&V entered into a contract for the replacement of air conditioning units at the Lexington, Kentucky Veterans Hospital identified as Job number VA249C-0235, Replace A/C 3 & A/C 4, CDD ("Project"). In conjunction with the above contract, 2H&V entered into a subcontract agreement with Sergent Systems, Inc. ("Sergent") to furnish certain labor and material on the Project (the "Subcontract").

Sergent was required to provide a performance bond to secure its performance on the Project. For purposes of this motion only, International issued a Subcontract Performance Bond

and Subcontract Labor and Material Payment Bond on behalf of Sergent, each in the penal sum of $404,000.00. 2H&V maintains that Sergent "walked off the project on June 23, 2008" and made demand upon International to perform pursuant to the terms of its Bonds. After investigating the circumstances surrounding the claim, International denied liability under the bonds.

On September 24, 2008, 2H&V filed its Complaint in this matter alleging, among other things, that International acted in bad faith in denying 2H&V's claim. Specifically, Count IV alleges that International breached a duty of good faith and fair dealing to 2H&V. International filed its Answer denying the allegations of the Complaint and any liability under the Bonds. International now moves to Dismiss Count IV of 2H&V's Complaint pursuant to Rule 12.02(f) for failure to state a claim for which relief may be granted.

## STANDARD OF REVIEW FOR MOTION TO DISMISS

Dismissal pursuant to CR 12.02(f) is "proper only if 'it appears the pleading party would not be entitled to relief under any set of facts which could be proved in support of his claim.'" Commonwealth v. Anthem Insurance Companies, 8 S.W.3d 48 (Ky. App. 1999), quoting Pari-Mutuel Clerks' Union v. Ky. Jockey Club, Ky, 551 S.W.2d 801 (KY 1977).

> In making this decision, the circuit court is not required to make any factual determination; rather, the question is purely a matter of law. Stated another way, the court must ask if the facts alleged in the complaint can be proved, would the plaintiff be entitled to relief? *James v. Wilson,* 95 S.W.3d 875 (Ky. App. 2002)

In the present matter, while International disputes the allegations made in 2H&V's Complaint, even if 2H&V were able to demonstrate facts to support its claims that International has breached a duty of good faith and fair dealing, as a matter of law, 2H&V would not be entitled to relief for any claims for this tort of bad faith.

2

I.     <u>CASE LAW HOLDING THAT SURETIES ARE NOT SUBJECT TO</u>
<u>BAD FAITH CLAIMS</u>.

"Performance Bonds always create a triparte relationship.  There is the 'Principal'
(typically the general contractor) who has assumed the contractual undertaking.  There is an
'obligee' (typically the project owner) who is due the benefits of the principal's performance.
And there is the 'surety' who provides the performance bond that secondarily guarantees to the
obligee performance of the principal's contractual undertaking."[1]  Sureties provide a surety bond
to secure a contract between an obligee and principal.  The terms of the parties' agreements are
set forth in the underlying contract between the principal and obligee, and the bond guaranteeing
that contract, which typically incorporates the contract and which limits the surety's exposure to
its penal sum.

A fundamental rule of suretyship is that a surety's liability to the obligee is strictly
derivative of, contingent upon, and measured and limited by the principal's liability.  *Taylor
Bldg. Corp. of Kentucky v. Boutcher,* 836 S.W.2d 455 (Ky. App. 1992).  In addition as one court
from Texas has stated:

> A contract of suretyship is an accessory agreement in the nature of a collateral
> engagement to pay the principal's obligations.  Being an accessory to the
> obligations of the principal obligor, it is essential that there be a valid obligation
> of the principal, and the nullity of the principal's obligation necessarily induces
> the nullity of the accessory.  Unless a cause of action exists against the principal,
> it cannot exist against the surety.  The extent of the principal indemnitor's liability
> determines the liability of the surety.  *Girard Fire & Marine Ins. Co. v.
> Koenigsberg,* 65 S.W.2d 783, 786 (Tex.Civ.App. 1933).

In other words, an obligee may only recover from a surety if the obligee could recover from the
principal.  In turn, a surety is entitled to recover from the principal as the primary "wrongdoer"

---

[1]     The Law of Performance Bonds, Second Edition (Vollbrecht, Thomas J. and Jacqueline Lewis, 2009
American Bar Association at 5).

and ultimate indemnitor.  The obligations of a surety are equivalent to that of a guarantor, which arise only in the event of a default by the principal.

In *BELL BCI Company v. HRGM Corporation, et. al,* 376 F.Supp.3d 462 (D. Md., 2003) the District Court considered a case involving a claim of bad faith against a surety on a performance bond issued on behalf of a subcontractor in favor of a construction contractor on a construction project at a Naval Air Station in Maryland.  BELL (the bond obligee) alleged bad faith on behalf of the surety and sought to raise a tort action against the surety for breach of fair dealing and good faith.  In *BELL,* the court refused to recognize the surety's alleged failure to perform under its surety contract as a basis for a tort action for bad faith stating that:

> Under Maryland law, "a contract of suretyship is a tripartite agreement between a principal obligor, his obligee, and a surety, whereby the surety becomes liable to the obligee at once upon the failure of the principal to perform." *Inst. of Mission Helpers of Baltimore City v. Reliance Ins. Co.,* 812 F.Supp. 72, 74 (D.Md.1992). Thus, "[t]he traditional rules of contract interpretation determine the liability of a surety." *Id.*

> In *Republic Ins. Co. v. Bd. of County Comm'rs of St. Mary's County,* 68 Md.App. 428, 511 A.2d 1136 (1986) (" *Republic I* "), the Maryland Court of Appeals stated:

> Maryland does not recognize failure to perform a contract as giving rise to a tort action for "bad faith." Indeed, if the [obligee] were successful in its attempt [to plead a failure to perform a contract claim as a tort action for bad faith], practically every breach of contract would give rise to an action in tort for "bad faith." Every breach of contract could, and probably would, result in claims in both contract and tort. The "bad faith" allegation would likely become a "boiler plate" averment in every suit for breach of contract.

> We refuse to employ some supposed "public policy" argument which would obfuscate the distinction between contract and tort by intertwining one with the other. Instead, we hold that a breach of contract does not, under the circumstances of this case, give rise to a tort action for "bad faith." *Id.* at 1138; *see also Mission Helpers,* 812 F.Supp. at 74.

The Court in *BELL* noted that in a subsequent case, *Republic Ins. Co. v. Prince George's County,* 92 Md. App. 528, 608 A.2d 1301 (1992) (Republic II) the Maryland Court of Appeals had not allowed the obligee to assert a claim of bad faith against the surety.  *Id.* at 464.

The Supreme Court of Texas, in *Great American Ins. Co. v. North Austin Municipal Utility Dist. No. 1,* 908 S.W.2d 415 (Tex. 1995), held that under the Texas Insurance Code the "business of insurance" did not include suretyship for the purposes of the "unfair or deceptive trade practices" section of the Texas Insurance Code.  In *Great American*, the public owner awarded a construction contract to a utilities contractor for upgrading a wastewater lift station. Great American Insurance Company ("the surety") issued performance, payment and maintenance bonds in favor of the public owner, as obligee, to secure the contract with the utility contractor, as principal.

At trial, the obligee prevailed on the underlying contract dispute.  In addition, the surety was found liable under the Texas equivalent of the UCSPA and a common law theory of bad faith.  This decision was affirmed by the Court of Appeals.  However, the Texas Supreme Court reversed on the bad faith issues.  It addressed the tort claim by first establishing that the duty of good faith and fair dealing underpinning such a claim in insurance litigation was not imposed merely on account of the insurer's status as an insurer.  The duty only attached because of an insurer's "special relationship" with an insured.  The duty is imposed to prevent an insurer from taking advantage of its superior bargaining power as against a vulnerable insured.  *Id.*

The Court held that the factors giving rise to this "special relationship" are: (1) unequal bargaining power; (2) the nature of insurance contracts which permit unscrupulous insurers to take advantage of insured's misfortune in claim resolution; and (3) the insurer's exclusive

control over claim evaluation process.  *Id.*  The Court rejected imposing the duties attendant to this "special relationship" upon sureties because sureties possess none of these characteristics.

The Court stated that the bonds incorporate the terms of the contract, which is written by the obligee such as in the case at bar.  The Court also stated that a surety cannot take advantage of an obligee.  The Court held that in the tripartite relationship created by suretyship, the surety's obligations are intended to supplement that of the principal.  The Court also noted that the obligee had a remedy against the principal whereas the traditional insured only has recourse against the insurer.

In addition, the Court held that a surety has a right to assert the principal's defenses.  Imposing a common law duty goes directly against a surety's right to require suit and judgment against the principal.  The Court finally noted that the obligee and principal have no "special relationship."  Therefore, the surety's derivative relationship with the obligee does not involve a "special relationship."  The surety, like its principal, should be entitled to test the merits of an obligee's claim, subject to the common law of contracts which is not punitive in nature.  For all of these reasons, the Court held that the plaintiff could not assert a common law claim for bad faith against a surety in Texas.

In yet another case dealing with the issue of surety bad faith, *Cates Construction, Inc. v. Talbot Partners*, 86 Cal.Rpt. 855, 980 P.2d 407 (Cal. 1999), the Supreme Court of California held that as a matter of law, the obligee could not recover in tort, for a surety's breach of the covenant of good faith and fair dealing implicit in a performance bond.  As is typical, the dispute in *Cates* arose from a construction project gone bad.  Talbot hired Cates to build a condominium project in Malibu, California.  Cates obtained a performance bond, and a labor and materials bond from Transamerica Insurance Company ("the surety").  As time went by, Cates fell further

and further behind on the project, and when Talbot refused to pay for any more cost overruns, Cates abandoned the job and recorded a mechanic's lien against the project.  A lawsuit ensued between the surety and Cates and Talbot, with Talbot alleging that the surety had tortiously breached its duty of good faith and fair dealing under the bond.  The contract claims were disposed of at a bench trial, but the remaining cause of action for tortious breach of the duty of good faith was tried to a jury.

The jury found that the surety breached its performance bond obligations by failing to adequately investigate the obligee's claims; pursuing the mechanic's lien suit without conducting an adequate investigation; failing to promptly take over and complete the bonded project when the principal's default was readily apparent; failing to complete the contract; and, failing to promptly pay subcontractor's claim.  Thereafter the jury, sitting on a tort claim against the surety for its alleged breach of the implied covenant of good faith and fair dealing, found that the surety breached the covenant and was guilty of malice and oppression.  The jury awarded $28,000,000 in punitive damages against the surety.  The California Court of Appeals upheld the award, (although it reduced the award for punitive damages) finding that the surety bond was the equivalent of insurance such that Talbot could recover tort damages for breach of the duty of good faith fair dealing under the bond.

On appeal, the Supreme Court of California, vacated the punitive damages award and limited the surety's liability to compensatory damages.  The Supreme Court concluded that as a matter of law the remedy for the surety's breach of the implied covenant of good faith and fair dealing is in contract, not in tort; that tort remedies were not available for the surety's breach in the context of the performance bond or any other "contract of suretyship" because a suretyship relationship is fundamentally different from an insurance relationship; the statute did not provide

a remedy in tort against a surety; and, contrary to insurance policies, surety performance bonds are not marked by elements of adhesion and unequal bargaining power, public interest issues, or fiduciary duties.

As set out herein, the Commonwealth of Kentucky, likewise, does not recognize a cause of action in tort for the surety's alleged breach of the covenant of good faith and fair dealing.

## II.    THE KENTUCKEY UNFAIR CLAIMS SETTLEMENT PRACTICES ACT DOES NOT RECOGNIZE BAD FAITH CLAIMS AGAINST SURETIES.

### A.    The Conflicting Concepts of Insurance and Suretyship.

A contract of insurance defines the respective obligations, duties, rights and privileges of two parties; i.e. the insured and the insurer.  In the event of a covered loss, the insurer reimburses or indemnifies the named insured for its loss, according to the conditions and terms of the contract of insurance.

> An insurance policy is a contract of indemnity whereby the insurer agrees to indemnify the insured for any loss resulting from a specific event. The insurer undertakes the obligation based on an evaluation of the market's wide risks and losses.

*Buck Run Baptist Church, Inc. v. Cumberland Surety Insurance Company,* 983 S.W.2d 501, 504 (Ky. 1998).  A surety bond, is a written contract between three parties, i.e. the principal, surety and obligee. These three parties, jointly, create a surety relationship, that creates rights, obligations and privileges between the respective parties.

When a surety executes a surety bond, such as the bond executed by International in this case, the surety guarantees to the obligee, the performance of the principal.  Unlike an insurance policy, a surety bond is not a contract complete in itself, but it rests upon the underlying construction contract.  For example, the performance bond that was issued by International on

behalf of Sergent to guarantee the performance of the underlying construction subcontract in favor of 2H&V states in pertinent part:

> NOW, THEREFORE, THE CONDITION OF THIS OBLIGATION IS SUCH, That, if Principal shall promptly and faithfully perform said subcontract, then this obligation shall be null and void; otherwise it shall remain in full force and effect.

### B.    The General Rules Of Statutory Construction.

When words used in a statute are specifically defined in the legislation, courts must use the definition prescribed by the statute for its interpretation. See, e.g., *Young v. Board of Graves County, Ky*. App., 661 S.W.2d 787 (1983). In the absence of a specific definition, however, a court will assume that the word is used in its common application. See, e.g., *Court of Justice v. Oney*, 34 S.W.3d 814 (Ky. Ct. App. 2000) ("Words of a statute, if clear, are determinative of legislative intent."), and see also, *Louisville Country Club, Inc. v. Gray*, 178 F.Supp. 915 (W.D.Ky. 1960) aff'd 285 F.2d 532 (6th Cir. 1959), and KRS 446.080(4) provides that:

> All words and phrases shall be construed according to the common and approved usage of language, but technical words and phrases, and such others as may have acquired a peculiar and appropriate meaning in the law, shall be construed according to such meaning.

When a statute's meaning is unclear given its language, a court may look to outside sources, "such as legislative history, administrative regulations promulgated by the agency charged with enforcement, and policy considerations, to interpret the statute's meaning . . . ." *Cooper Development Co., Inc. v. First National Bank of Boston*, 762 F.Supp. 1145, 1151 (D.N.J. 1991). In addition, the context and background of a statutory enactment is an equally important tool of statutory construction. *U.S. v. Speer*, 824 F.Supp. 111 (W.D.Ky. 1993). However, in no case will a court construe a statute so as to lead to an absurd result. See, e.g., *Bailey v. Reeves*, 662 S.W.2d 832 (Ky. 1984); *Overnite Trans. Co. v. Gaddis*, 793 S.W.2d 129 (Ky. App. 1990).

Another fundamental principle of statutory construction is the maxim "expressio unius est exclusio alterius:" the expression of one thing implies the exclusion of another thing not specifically mentioned.   See, e.g. *Collins v. Commonwealth Natural Resources & Envtl. Protection Cabinet*, 10 S.W.3d 122 (Ky. 1999), *Palmer v. Commonwealth,* 3 S.W.3d 763, 764 (Ky. Ct. App. 1999), *Louisville Water Company v. Wells,* 664 S.W.2d 525 (Ky. App. 1984), *Smith v. Wedding,* 303 S.W.2d 322 (Ky. 1957), *Steinfeld v. Jefferson County Fiscal Court*, 229 S.W.2d 319 (Ky. 1950).  This principle is particularly important to the issue before the Court.

### C.   The General And Limited Application of The Insurance Code to Sureties.

Surety contracts, though fundamentally different from other types of insurance, are generally defined as a type of "insurance" in KRS 304.1-030.  A more specific definition of "surety insurance" can be found in KRS 304.5-060.  Although these provisions define the meaning of "insurance" and "surety insurance" as those terms are used in the Code,[2] surety bonds fall within the Insurance Code's regulatory scheme under Subtitle 21, entitled "Surety Insurance Contracts", pursuant to KRS 304.21-010, which states:

> **Surety contracts subject to general provisions**. -- All contracts of surety insurance covering subjects of insurance resident, located, or to be performed in this state are subject to the applicable provisions of **this subtitle, subtitle 14, and other applicable provisions** of this Code. *Id.* (Emphasis added).[3]

---

[2]   It must be noted that these definitions are inapplicable in this case because these terms are not used in KRS 304.12-230, the Unfair Claims Settlement Practices Act portions of the Kentucky Insurance Code.

[3]   The fact that the Kentucky General Assembly chose to subject sureties to the jurisdiction of the Insurance Commission so that they may be regulated, does not imply that the General Assembly intended to regulate sureties under the particular provisions of KRS 304.12-230 or KRS 304.12-235.

**D.**    **Application Of The Rules Of Statutory Construction Support International's Position That The Kentucky Unfair Claims Settlement Practices Act Does Not Apply To Sureties.**

KRS 304.21-010 makes it clear that surety contracts are subject to the provisions of Subtitles 21 and 14 and other <u>applicable</u> provisions of the Insurance Code. (Subtitle 21 is titled "Surety Insurance Contracts" and Subtitle 14 is titled "The Insurance Contract"). No other provision of the Code is specifically enumerated within KRS 304.21-010, and therefore this Court must determine if KRS 304.12-230 comes within the purview of "other applicable provisions". The significant point here is that surety contracts are <u>not</u> subject to <u>all</u> of the provisions of the Insurance Code. Otherwise, the legislature would have made sureties subject to "all provisions" of the Code instead of "other applicable provisions", and it would have been unnecessary to specifically enumerate Subtitles 21 and 14 in KRS 304.12-010.[4]

Whether a particular provision of the Insurance Code is one of the "other applicable provisions" cannot be determined from the language of KRS 304.21-010 alone. Instead, this determination must be made by examining the particular provision in question, and applying the foregoing rules of statutory construction and instructive precedent. The application of the rules of statutory construction, support International's position that the UCSPA does not apply to sureties.

---

[4]    KRS Sections 304.12-230 is a provision within Subtitle 12 of the Insurance Code of Kentucky and constitutes the substantive provisions of the Unfair Claims Settlement Practices Act. These provisions are regulatory and are enforceable by the Insurance Commissioner pursuant to KRS 304.2-010, <u>et seq.</u> <u>State Farm Mut. Auto. Ins. Co. v. Reeder</u>, 763 S.W.2d 116 (Ky. 1988); <u>Cummings v. Thomas Indus., Inc.</u>, 812 F.Supp. 44 (W.D. Ky. 1993).

1.    <u>The Language Of The Kentucky UCSPA Is Inconsistent With Surety Practice</u>.

That the Legislature did not intend for the UCSPA to apply to sureties, can first be found in the particular language used in KRS 304.12-230 and KRS 304.12-235.  KRS 304.12-230 defines what is an "unfair practice" in the insurance industry by reference to what acts are prohibited in regard to claims made under "insurance policies."

The term "insurance policy" is not defined in the UCSPA.[5]  Absent a specific definition in the UCSPA, the language used should be given its common meaning.[6]  *Louisville Country Club, supra.*  An insurance policy is a document used in traditional insurance to define the terms and scope of coverage.  The term "insurance policy" is not used in the surety business.  Sureties provide a surety bond to secure a contract between an obligee and principal.  The terms of the parties' agreements are set forth in the underlying contract between the principal and obligee, and the bond guaranteeing that contract (which typically incorporates the contract and which limits the surety's exposure to its penal sum).  Simply put, there are no "insurance policies" in suretyship.

The provisions of KRS 304.12-230 only pertain to insurance policies, not surety bonds.  Because it did not issue an insurance policy(ies), International could not (1) misrepresent coverage in an insurance policy, (2) fail to act promptly in regard to communications regarding claims under an insurance policy, (3) fail to adopt and implement reasonable standards to investigate claims under an insurance policy, (4) compel an insured to litigate claims under an

---

[5]    Both "insurance policy" and "insurance contract" are, however, defined in the insurance regulations enacted to effectuate the Unfair Claims Settlement Practices Act.  Quite significantly, these regulations define "insurance policy" and "contract" <u>to</u> <u>exclude</u> <u>sureties</u>.  806 KAR 12:095, Section 1(10) and Section 2(1).  <u>See also</u>, 1990 Model Act, <u>infra</u>, section 2(e).

[6]    In this case, the regulatory definitions <u>must</u> be followed.  <u>See</u>, <u>supra</u>, Section I.A.  However, even if the Court disregards the regulations, the ordinary meaning of "insurance policies" compels the same conclusion as the regulations -- sureties are simply not regulated under these provisions.

insurance policy or (5) fail to promptly settle with an insured under one provision of an insurance policy in order to coerce settlement of a claim under another provision of the policy or fail to comply with any of the other insurance specific provisions of  KRS 304.12-230.  It is thus clear from reading KRS 304.21-010 that there are statutes or provisions of the Insurance Code which are obviously <u>not</u> "applicable" to surety contracts of insurance.

KRS 304.5-060(2) defines surety insurance as "insurance guaranteeing the performance of contracts, other than insurance policies and guaranteeing and executing bonds, undertakings, and contracts of suretyship." Surety claims, unlike property and casualty claims under policies, are determined with reference to the positions of the parties involved in the suretyship relationship; namely, the surety, the principal and the obligee.  More often than not, the amount of money and the issues relating to surety claim disputes are so complicated and intertwined with non-insurance issues that it may take months or years before the respective parties are sure of their respective rights, obligations and duties, *vis-à-vis* the suretyship relationship.

In the case of a surety contract, the party who purchases the bond, the principal, purchases it to satisfy the requirements of another party, the obligee, who requires the principal to issue the guarantee from the surety as protection to the obligee for defaults of the principal. None of these parties is the equivalent of a "named insured" under a property and casualty policy, and under no circumstances would you find anyone who resembles a "named insured" filing what the statute refers to as a "proof of claim".  The relevant portions of the Insurance Code dealing with bad faith claims do not prohibit or even address activities of sureties and are not intended to do so.  These provisions are intended to regulate traditional insurers and to protect their insureds from coercion and misconduct related to "insurance policies."  For these reasons, 2H&V's bad faith claim should be dismissed.

2.    **The Background Of The UCSPA Establishes That Sureties Are Not Within Its Scope.**

KRS 304.12-230 deals with "Unfair Claim Settlement Practices" and was enacted in 1984 ("USCPA").   On the other hand, KRS 304.21-010 (which subjects sureties to Subtitles 21 and 14 and "other applicable provisions" of the Code), was enacted in 1970.  Therefore, at the time the UCSPA was enacted, the general "catchall" language of KRS 304.21-010 was well established.  Had the Kentucky General Assembly intended for the UCSPA to be one of the "other applicable provisions" of the Code governing sureties, it would have specifically referred to the UCSPA provisions or would have expressly made surety contracts subject to the provisions of Subtitle 12, in addition to Subtitle 21 and Subtitle 14.  The relevant subtitle, Subtitle 12, however, makes no specific reference to sureties and uses language inconsistent with its application to sureties.  Therefore, it can be inferred that the Kentucky General Assembly did not intend for the UCSPA to apply to the surety industry.

Moreover, KRS 304.12-230 [a part of the UCSPA] was:

> [b]ased on the 1971 amendment that the National Association of Insurance Commissioners ["the NAIC"] made to its model 'act relating to unfair methods of competition and unfair and deceptive acts and practices in the business of insurance' ["the 1971 Model Act"].  *State Farm, supra,* at 118.

Although Kentucky modeled its statutes after the 1971 Model Act, there are important distinctions between these Acts.  One fundamental distinction is that the 1971 Model Act specifically defined "policy" to mean:

> Any contract of insurance, indemnity, medical, health or hospital service, suretyship, or annuity issued, proposed for issuance, or intended for issuance by any insurer.  Id. at § 2(e).   (Emphasis added).

Kentucky's decision not to adopt the provision including sureties within the Act's prohibitions is in line with the trend away from making such acts applicable to sureties and is

evidence of the express intent for the UCSPA not to apply to surety investigations.  This is because surety investigations are unique and are not suitable to rules and regulations governing property and casualty investigations.  Later, in 1984, when Kentucky adopted its modified version of the 1971 Model Act, that Act had been in place for 13 years and had become somewhat antiquated.  In particular, the wisdom of subjecting sureties to an act designed to regulate traditional insurers was questionable.  As a result, shortly after Kentucky adopted its version of the 1971 Model Act [which version chose to omit the specific reference to suretyship noted above], the NAIC amended the Model Act to create a separate Unfair Claims Settlement Practices Act ("the 1990 Model Act").  Whereas the 1971 Model Act specifically included sureties within its scope, in contrast, the 1990 Model Act specifically excluded sureties from its application.  Section 1 of the 1990 Model Act provides:

> The purpose of this Act is to set forth standards for the investigation and disposition of claims arising under policies or certificates of insurance issued to residents of [insert state].  It **is not intended to cover** claims involving workers' compensation, fidelity, **suretyship** or boiler and machinery insurance.  *Id.* (Emphasis added).

Section 2(e) of the 1990 Model Act further provides:

> **"Policy"** or **"certificate"** for purposes of this Act, **shall not mean** contracts of workers' compensation, fidelity, **suretyship** or boiler and machinery insurance. Id.  (Emphasis added).

Because the 1990 Model Act was enacted subsequent to Kentucky's partial adoption of the 1971 Model Act, it was not available for use as a model for KRS 304.12-230 enacted in 1984.  However, Kentucky's knowing choice not to adopt the provision of the then existing 1971 Model Act which had included sureties within its scope shows the Legislatures' intent not to include sureties and, as such, Kentucky's version is in line with the contemporary 1990 Model Act because both exclude sureties from its application.

In addition to being in line with the 1990 Model Act, Kentucky's decision not to include sureties within the scope of its Act, is also consistent with recent legislation in Texas and Florida. During the 2005 legislative session, the Florida legislature enacted chapter 2005-218, which specifically declared that a surety is not to be considered an insurer on public works projects. See Fla. Stat 624.155 (9). "A surety issuing a payment or performance bond on the construction or maintenance of a building or roadway project is not an insurer for purposes of subsection (1)." Through this act, the Florida legislature, specifically excluded sureties on public works projects from the unfair settlement practices provisions of the Florida Statutes.

In 2003, the State of Texas enacted 78th Legislative Session Chapter 1274, which was effective April 1, 2005.  This legislation declared that the Deceptive, Unfair and Prohibited Practices portion of the Texas Insurance Code does not apply to "fidelity, surety, or guaranty bonds" Tex. Ins. Code § 542.053 (2005).

Not only does the exclusion of sureties from the Kentucky Act, comport with the 1990 Model Act and the recent enactments of the Commonwealth's sister states, the regulations enacted by the Insurance Commission to effectuate the Act define "policy," "certificate" and "contract" in an identical manner and with identical language as that used in the 1990 Model Act's Section 2(e) definition of "policy" and "certificate."  See 806 KAR 12:095 Sections 1(10) and 2(1).  When these facts are considered together, it is clear that Kentucky's UCSPA does not regulate sureties.  Thus Kentucky has not enacted legislation authorizing a cause of action in tort against a surety for its alleged breach of the covenant of good faith and fair dealing.  As these are the same claims asserted by 2H&V in Count IV of its Complaint, this Count should be dismissed.

**3.    The Kentucky Administrative Regulations   Exclude Sureties From Application Of The Unfair Claims Settlement Practices Act**.

Where statutory language, legislative history and background do not speak directly to an issue before the court, the court "<u>must</u> uphold a construction of the statute rendered by the agency entrusted with interpreting it." *Cooper Development*, supra at 1151 (Emphasis added). "If an agency's construction is reasonable, a court <u>must defer to it</u> even though it may not be the only interpretation or even the most reasonable one." *Id.* at 1151 (citing *Smith v. Fidelity Discount Consumer Co.,* 898 F.2d 907 (3d Cir. 1990); *Kean v. Heckler,* 799 F.2d 895 (3d Cir. 1986)) (Emphasis added); See also, *Wittmer v. Jones,* 864 S.W.2d 885 (Ky. 1993) (applying 806 KAR 12:090, in a case involving the Unfair Claims Settlement Practices Act) and see *Davidson v. American Freightways, Inc.,* 25 S.W.3d 94 (Ky 2000) (The Court relied on regulation 806 KAR 12:090, in determining that the Unfair Claims Settlement Practices Act does not apply to self-insured motor carriers).  Consequently, the Agency's interpretation supports International's position.

The Insurance Commissioner has authority to create regulations effectuating the provisions of the Insurance Code pursuant to KRS 304.2-110, which provides in pertinent part:

> The Commissioner may make reasonable rules and regulations necessary for or as an aid to the effectuation of any provision of this Code.  No such rule or regulation shall extend, modify, or conflict with any law of this State or the reasonable implications thereof.

Pursuant to this power, the Commission enacted 806 KAR 12:095 to effectuate the provisions of the UCSPA.  806 KAR 12:095 § 1(1) states in pertinent part:

> "(11) "Policy", or "certificate", or "contract" means any contract of insurance or indemnity, except for:
>
> (a) Fidelity, suretyship, or boiler and machinery insurance; or
>
> (b) A contract of workers' compensation insurance unless it satisfies the requirements   of Section 2 of this administrative regulation."

17

Id. (compare with the 1990 Model Act definition of "policy" and "certificate," infra, Section 2(e)).

Similarly, 806 KAR 12:095 § 2(1) states in pertinent part:

Section 2. Scope and Purpose of this Administrative Regulation. (1) This administrative regulation establishes minimum standards for the investigation and disposition of property and casualty insurance claims arising under policies, certificates, and contracts. This administrative regulation shall not cover claims involving fidelity, suretyship, or boiler and machinery insurance. This administrative regulation shall not cover claims involving workers' compensation if those questions arise under KRS Chapter 342 since those questions shall be resolved by workers' compensation administrative law judges or arbitrators, pursuant to KRS 342.325. This administrative regulation shall apply to claims for unearned premium refunds under workers' compensation policies since workers' compensation administrative law judges or arbitrators do not have jurisdiction over those claims. This administrative regulation establishes procedures and practices which constitute unfair claims settlement practices."

These regulations establish guidelines used by the Commission to effectuate the Act and plainly and unambiguously exclude sureties from the UCSPA's prohibitions.  In its Complaint, 2H&V is attempting to assert a claim against International for its alleged breach of the "duty of good faith and fair dealing," while serving as Sergent's surety.  If the regulations establishing the guidelines used by the Commission to effectuate the Act excludes sureties, there can be no private cause of action against International under the UCSPA.  The primary purpose of the UCSPA is to provide agency enforcement of claims brought thereunder and, if International's actions cannot be the subject of such agency enforcement, they cannot be the basis of a civil lawsuit founded upon these same regulatory provisions.

Given the common understanding of the term "insurance policy," the background of the UCSPA, Kentucky's choice not to adopt the provision of the 1971 Model Act including sureties within its scope and Kentucky's UCSPA, the Commission's regulation defining "insurance policy" to exclude suretyship is consistent and reasonable.  As such, 2H&V has no statutory basis under Kentucky law to assert a cause of action in tort for the surety's alleged breach of the

covenant of good faith and fair dealing and the Court should dismiss Count IV of 2H&V's Complaint.

These principles were illustrated in *Federal Insurance Co. v. Maine Yankee Atomic Power Co.,* 183 F. Supp.2d 76, (D.C. Maine 2001). Federal Insurance Company issued a surety bond, for a project of which Maine Yankee was the owner/obligee. Work was started to decommission a nuclear power plant, but the work quickly fell behind. Maine Yankee declared the contractor in default. To keep the project on schedule, Maine Yankee elected, with the surety's consent, to pay the subcontractors and materialmen directly and reserved its rights under the performance bond, but not the payment bond. Once Maine Yankee completed the project, it brought suit against Federal on claims of unjust enrichment, and violation of the Maine Unfair Claims Settlement Practices Act.

The central issue for the court was whether a surety bond was subject to the State of Maine Unfair Claims Settlement Practices statute. Like the Kentucky Unfair Claims Settlement Practices Act, the Maine statute stated that all contracts of surety insurance delivered or issued for delivery in this state covering subjects resident, located, or to be performed in this state are also subject to the applicable provisions of Chapter 27. The Maine UCSPA is part of Chapter 27. Therefore, the court had to determine whether the Maine UCSPA was "applicable" to the surety relationship. The court's analysis stated:

> There is no explicit exclusion of suretyship in section 2436-A [Maine UCSPA] (only workers compensation is explicitly excluded). See 14-A M.R.S.A. § 2436-A(4) (2000). In that respect, section 2436-A is unlike section 2164-D, a provision granting rulemaking power to the Superintendent of the Bureau of Insurance to regulate certain unfair claims practices, which does explicitly exclude suretyship coverage. See 24-A M.R.S.A. § 2364-D(9) (2000). Instead, section 2436-A [UCSPA] provides civil remedies to any person injured by certain actions 'taken by that person's own insurer.' 24-A M.R.S.A. §2436-A(1). The relevant question on a performance bond covering a construction contract, then, is whether the surety company is the owner's 'own insurer'"

*** 

It is true that a general contractor purchases a performance surety bond only because an owner requires it, and necessarily calculates the cost of the bond into its contract price either directly or indirectly or as part of overhead, but that does not alter whose insurer the bonding company is.  It is also true that a performance bond names the owner as the obligee of the performance obligation owed by both the general contractor and the surety insurance company.  As a result, the owner is the beneficiary of the surety's obligation in the event the contractor defaults, but that too hardly makes the surety the owner's 'own insurer.'

Even cases that treat bonding issues as closely akin to insurance issues (for purposes of deciding whether to recognize a tort cause of action for bad faith) recognize the awkwardness that results, since the commercial surety must often handle simultaneous claims from both the principal, its customer, and the obligee owner.  See, e.g. *Transamerica Premier Ins. Co.,* 940 P.2d at 353 n.4.

* * *

The natural reading of section 2436-A [UCSPA] is that a surety insurance company is not the owner's 'own insurer' for either a payment or a performance bond that a general contractor has purchased under the requirements of a contract for a construction project.  Certainly owners have their 'own insurer' for any number of other risks, but for the performance of the contract, they seek to have the general contractor's own insurer guarantee it.  Moreover, the Maine Law Court has declared provisions like sections 2436-A to be penal, requiring that their scope of coverage be construed narrowly.  (Citations omitted.)  Applying this canon, I conclude that section 2436-A should not be read to apply to an owner's claim under a surety performance bond purchased by the general contractor.  *Id*. at 89-90.

The *Maine Yankee* court's reasoning that Maine's UCSPA did not apply to a payment bond issued by surety is equally applicable in this case.

**4**.    **The Fundamental Common Law Differences Between Surety Contracts And Other Forms Of Insurance Make Application Of The Unfair Claims Settlement Practices Act To Sureties Illogical.**

KRS 304.12-230 clearly applies to insurance companies considering the common meaning of the language, the background of these statutes, and the Commission's regulations.  However, Kentucky's UCSPA is entirely inconsistent with fundamental principles of suretyship.  Forced application of the UCSPA to sureties is not only illogical, but counter-productive.

A surety bond, although subject to certain provisions of the Insurance Code, is significantly different from an insurance policy as such policies are commonly understood.

> (I)nsurance contracts and suretyship contracts 'involve different functions, relationships, rights and obligations; and have been recognized and treated by the profession as distinctive fields of law for generations.'  *Cincinnati Ins. Co. v. Centech Bldg. Corp.*, 286 F. Supp. 2d 669 (D.N.C. 2003) quoting *Henry Angelo & Sons, Inc. v. Property Dev. Corp.*, 63 N.C. App. 569 (N.C. Ct. App. 1983).

In *Centech*, the Court went on to note:

> that the mere fact that those cases mention similarities between suretyship and insurance 'no more justifies the conclusion that sureties are insurers and performance bonds are contracts of insurance than does the commonly known fact that sheep are somewhat like goats justify the conclusion that sheep are goats.' <u>Angelo</u>, 63 N.C. App. at 578, 306 S.E.2d at 168.  *Id.* at 689.

An insurance policy is a contract of indemnity whereby the insurer agrees to indemnify the insured for any losses resulting from a specific type of occurrence.  The insurer undertakes the obligation based upon an evaluation of market-wide risks and losses.  An insurer expects losses that <u>are actuarially predicted</u>.  The insurer spreads the costs of the losses throughout the market via its premiums.

In contrast, a surety bond is written based upon an evaluation of a particular contractor and its capability to perform a given contract.  Compensation for issuance of a surety bond is based on a fact-specific evaluation of the risks involved in the individual case and <u>no losses are expected</u>.  Toward that end, sureties typically maintain long standing relationships with the contractors they bond.

In short, a typical insurer is a conduit through which costs associated with common risks are pooled and spread across the market.  A surety, on the other hand, expects no losses and shoulders their brunt should they arise (subject to indemnification from the principal).[7]  The

---

[7]    This principle of indemnification is another distinguishing factor between suretyship and insurance. Sureties, both by statute, KRS 411.182, and generally by contract have a right of indemnification from their

surety attempts to minimize the risks by a process known as underwriting whereby an analysis of the principal is performed to determine the principal's abilities to perform the contract the surety is requested to bond.  As such, a surety's relationship to its principal is more like that of creditor/debtor than  insurer/insured.

In *Buck Run Baptist Church, Inc. v. Cumberland Surety Insurance Company, Ky.*, 983 S.W.2d (1998), 501 the Supreme Court of Kentucky explained the distinctions between sureties and insurance carriers.

> A contract of suretyship is not a contract of insurance.  The distinctions between the two are significant in the context of arbitration because they emphasize why the legislature would not permit an insurer to compel arbitrations.  In the Insurance Code itself, surety insurance is separately defined in KRS 304.5-060.  In the absence of a specific definition of insurance in KRS 417.050, the word in its common application.  CF Louisville Country Club, Inc. v. Gray, 178 F.Supp. 915 (W.D. Ky. 1959).  An insurance policy is a contract of indemnity whereby the insurer agrees to indemnify the insured for any loss resulting from a specific event.  The insurer undertakes the obligation based on an evaluation of the market's wide risks and losses.  An insurer expects losses, and they are actuarially predicted.  The costs of such losses are spread through the market by means of a premium.  (Emphasis added.)
>
> In contrast, a surety bond is written based on an evaluation of a particular contract or in the capacity to perform a given contract.  Compensation for the issuance of a surety bond is based on a fact-specific evaluation of the risks involved in each individual case.  No losses are expected.  Sureties maintain close relationships with a contractor as they bond and require the contractor to sign an indemnity contract in favor of the surety company.  As such, a surety's relationship to its principal is more like that of a creditor/debtor than that of the traditional insurer/insured.  See National Shawmut Bank of Boston v. New Amsterdam Casualty Co., 411 F.2d 843 (1st Cir. 1969).

In *National Shawmut Bank v. New Amsterdam Cas. Co.*, 411 F.2d 843 (lst Cir. 1969), the First Circuit has stated:

> The business of a construction contract surety is not one of ordinary insurance, for the risk is not actually linked to premiums, nor is there a pooling of risk. . .neither

---

principal for losses which the surety suffers.  Insurers have no right of subrogation or recovery from their insured for losses suffered by reason of the insured's actions.

is it the business of ordinary financing, for while the surety extends its credit to the owner. . .as the ultimate guarantee that the job will be done, this is a credit that may either never have to be drawn upon, or if it is drawn upon at all, will in all likelihood be overdrawn. . .In this hermaphroditic situation, the security for the surety is not the fee, but a compound of its confidence in the contractor and the opportunity to prevent or minimize its ultimate loss by its right to salvage the debacle by its own performance.

Unlike insurance policies, suretyship creates a tripartite relationship between the obligee, principal and surety.  An insurance policy, on the other hand, creates a bilateral relationship between the insured and the insurer.  In the tripartite relationship created by surety law, the principal and obligee are obligated to one another pursuant to the underlying contract.  The surety is obligated to the obligee pursuant to the terms of the bond which usually incorporates the contract.  The principal, in turn, is obligated to indemnify the surety for losses.  Although both the surety and principal are primarily obligated to the obligee, as between the surety and the principal, the principal is primarily liable while the surety is secondarily liable.

As stated above, a fundamental rule of suretyship is that a surety's liability to the obligee is strictly derivative of, contingent upon, and measured and limited by the principal's liability. The application of the UCSPA is directly at odds with the derivative nature of a surety's liability. The threat of bad faith litigation forces a surety to either give up its right to assert the principal's defenses or face the prospect of punitive damages.  The principal, on the other hand, does not face the prospect of a bad faith claim and, thus, is allowed its day in court.  The law does not contemplate punishing the surety more severely for a principal's default than it does the principal.  Nor does the law contemplate allowing the principal to litigate its defenses without the prospect of extra-contractual damages, while, at the same time, coercing the surety into a quick settlement to avoid this prospect.  Any application of the UCSPA in this context would make the surety more responsible for the principal's wrongdoing than the principal itself.  This is contrary

to the basic premise that a surety's liability is strictly derivative of that of the principal and the statute should not be interpreted to reach this illogical result.

Further, a surety is an outsider to performance of the underlying contract and is not obligated to oversee the principal's performance thereunder. *Vastine v. Bank of Dallas,* 808 S.W.2d 463, 464 (Tex. 1991). To the contrary, the obligee is obligated to notify the surety of any default by the principal or of any material increase in the surety's risks. *Hochever v. Maryland Cas. Co.*, 114 F.2d 948 (6th Cir. 1940); Restatement Of The Law Of Security §§ 124-130. If the obligee fails to do so, a surety is entitled to assert defenses of untimely notice of default, material alteration of the bonded contract, unauthorized extension of time or overpayment or dissipation of funds that could have been applied to completion of the job. *T.O. Stanley Boot Co., Inc. v. Bank of El Paso*, 847 S.W.2d 218, 223 (Tex 1992); Restatement Of The Law Of Security § 129. In other words, it is the surety that needs protection from misconduct in these relationships, not the obligee or the principal. The surety, as an outsider to performance under the contract, faces the prospect of being duped by the obligee or principal. It is not reasonable to apply the UCSPA to superimpose statutory duties upon the surety to protect the obligee and reverse these long-established relationships by making the surety liable for extra-contractual damages in performance related disputes between an obligee and a principal.

Another fundamental rule of suretyship is that the financial obligation of a surety is limited to the penal sum of the bond. *Aetna Cas. And Sur. Co. v. U.S.*, 845 F.2d 971 (Fed.Cir. 1988); *In re Technology for Energy Corp.*, 140 B.R. 214 (E.D.Tenn. 1992). No recovery can be had beyond this penalty. *Bill Curphy Co. v. Elliot*, 207 F.2d 103, 106 (5th Cir. 1953). Allowing recovery of additional damages beyond those contemplated by the parties' agreement directly contradicts this precept and undermines the basic nature of the surety/obligee relationship.

Moreover, the UCSPA serves no useful purpose in suretyship law. The UCSPA is intended to protect insureds from abuse by insurers. Its application in the suretyship context, however, has the opposite effect. Unlike the typical insurer, a surety has little or no incentive to dispute a valid claim by an obligee. Delays in a construction project will typically compound an obligee's actual damages and, thereby, increase damages to a surety should it be found liable. The traditional insured's damages, on the other hand, are fixed by the time it seeks payment from an insurer. Without the threat provided by the UCSPA, an insurer has little incentive to act quickly to settle an insured's claim. The surety, on the other hand, is motivated to act quickly to avoid delay-induced damages but often cannot act as quickly as they would like because of the very nature of the relationship.

The traditional insured and insurer often have greatly unequal bargaining power. It would not be uncommon for an insured to face mounting hospital bills, loss of a car or home or claims by creditors for failure to pay bills if he or she is not quickly compensated for losses under an insurance policy. As a result, an unscrupulous insurer can use delay to coerce an unfair settlement from a vulnerable insured in dire need of money.

The typical surety and obligee, however, have more equal bargaining power. In fact, there is little, if any, unequal bargaining power between International and 2H&V. As a result, a surety, unlike a typical insurer, has little motivation to delay payment of a legitimate claim. Such delay will not coerce a quick settlement. In suretyship situations, contractual defaults may involve complex fact patterns, especially those involving a commercial construction project. See, e.g., *Turner Constr. Co. v. First Indem of America Ins. Co.,* 829 F.Supp. 752, 764 (E.D. Pa. 1993) (holding that given the complexity of the situation, a surety was not in bad faith for siding with the principal). When an obligee claims default, the surety must determine, among other

things, whether a breach has occurred, whether the breach is material, whether default or termination is justified by the breach, if there has been substantial completion and if there has been a delay and its cause. The surety must also determine the best course of action to resolve the dispute. As an outsider to the performance of the contract between the obligee and principal, the surety must find answers to these questions through analysis of bids, budgets, designs, inspections and correspondence and documents written by the parties and their agents. In a typical case, owners, obligees, architects, engineers, contractors and subcontractors may all have different theories as to what went wrong, if anything, and what is necessary to alleviate the problems.

In 2002, the United States District Court for the Eastern District of Pennsylvania, was called upon to review the issue of surety bad faith in the case of *Norwood Company v. RLI Insurance Company*, 2002 WL 485694 (No. 01-CV-6153, E.D. Pa. April, 2002). In *Norwood*, RLI issued a performance bond on behalf of a subcontractor, Bennett, naming the contractor, Norwood, as the obligee, for a project to produce and install glass fiber reinforced concrete panels for a construction project. The contractor later declared the subcontractor in default, and notified the surety demanding that it either complete the contract or take the steps necessary to insure that the principal would complete the contract. Eight days later, the surety advised that there was a dispute regarding the claim and it would take no action in the matter. The contractor then filed suit against RLI alleging bad faith.

In reviewing the Pennsylvania statute 42 Pa.C.S.A. §8371 in the judicial procedure title of the code relating to actions on insurance policies, the Court noted that when a court interprets a statute, the actual words in the statute should be given their plain meaning. From a review of

the statute the Court determined that the statute did not allow for a bad faith action against a

surety:

> Statutory construction begins with the actual words of the statute. See, e.g.,
> Superior Precast, 71 F. Supp. 2d at 450. Where an Act [*8] does not include a
> precise definition, "statutes are presumed to employ words in their popular and
> plain everyday sense, and the popular meaning of such words must prevail."
> Centolanza v. Lehigh Valley Dairies, Inc., 540 Pa. 398, 406, 658 A.2d 336, 340
> (1995). This Court is to "presume that a legislature says in a statute what it means
> and means in a statute what it says there. . . . When the words of a statute are
> unambiguous, then, this first canon is also the last: judicial inquiry is complete."
> Connecticut Nat'l Bank v. Germain, 503 U.S. 249, 253-54, 112 S. Ct. 1146, 1149,
> 117 L. Ed. 2d 391 (1992) (citations omitted).
>
> The title of § 8371 provides: "Actions on insurance policies," and the clear,
> unequivocal and unambiguous language of this section reads, in pertinent part,
> that the section applies only "in an action arising under an insurance policy." A
> policy of insurance is defined in Black's Law Dictionary as: "An instrument in
> writing, by which one party (insurer), in consideration of a premium, engages to
> indemnify another (insured) against a contingent loss, by making him a payment
> in compensation, whenever the event shall happen by which the loss is to accrue."
> Black's Law Dictionary 1156 (6th ed. 1991). A contract of suretyship is a unique
> tripartite legal relationship whereby "one person engages to be answerable for the
> debt, default or miscarriage of another." Id. at 1442. As Judge Giles observed, not
> only has "the United States Supreme Court . . . noted that 'the usual view,
> grounded in commercial practice, [is] that suretyship is not insurance,'" Superior
> Precast, 71 F. Supp. 2d at 451 (quoting Pearlman v. Reliance Ins. Co., 371 U.S.
> 132, 140 n.19, 83 S. Ct. 232, 236 n.19, 9 L. Ed. 2d 190 (1962)), but Pennsylvania
> courts have agreed, acknowledging that there exists "'fundamental differences'"
> between bilateral contracts of insurance and tripartite surety agreements, id.
> (quoting Grode v. Mutual Fire, Marine and Inland Ins. Co., 132 Pa. Commw. 196,
> 213, 572 A.2d 798, 806 (1990), aff'd in relevant part sub nom.  Foster v. Mutual
> Fire, Marine and Inland Ins. Co., 531 Pa. 598, 623, 614 A.2d 1086, 1099 (1992)).
> n2 See also Pullman Power, 1997 U.S. Dist. LEXIS 23554, at *9-10 (noting same
> distinct differences). Accordingly, the plain and popularly used language of the
> statute indicate that a suretyship is not included in § 8371's reach.

Norwood at 3.    The Court noted fundamental differences between insurance and surety

principles, and noted that the statute would not apply to surety situations.

With respect to the financial implications of an insurer versus a surety's failure to

perform, the Supreme Court of California in *Cates Construction, Inc. v. Talbot Partners*, '86 Cal.

Rpt. 855, 980 P.2d 407 (Cal. 1999) stated:

Although a construction surety's breach of the implied covenant might very well have financial significance for a performance bond obligee, the obligee does not face the same economic dilemma as an insured.  In contrast to an insured who typically can look only to the insurer for recovery in the event of covered loss, an obligee also has a right of recovery against the principal.  The right is not a hollow one, for unlike insurance, which contemplates the certainty of losses, sureties do not write performance bonds for principals who appear unable to perform the primary obligation and whose assets are insufficient to meet the contingency of default.  (Citation omitted)  Accordingly, an obligee's right of recovery against a principal is, in most cases of default, a meaningful right.

In addition, an obligee may contract with others in the marketplace to obtain completion of its construction project, and thereafter recover the reasonable cost of completion against the principal and surety.  (Citation omitted)  In effect, then a surety's breach of the implied covenant threatens to create no different a dilemma than that posed by the principal's default on the underlying construction contract. . .

Consequently, it should not be common for an owner [obligee] to confront the sort of economic dilemma that insured faces after catastrophic loss or accident, or for an owner to be particularly vulnerable to a surety's inaction.  *Id.* at 423-424.

## <u>CONCLUSION</u>

2H&V has asserted a cause of action against International for its purported breach of the duty of the covenant of good faith and fair dealing.  Under Kentucky law, such an action in resounds squarely in contract and for which no extra contractual liability exists. Further, in <u>Buck Run</u>, supra., the Kentucky Supreme Court specifically and expressly determined that a surety bond is not an insurance policy. As such, the legal authority cited and relied on hereinabove applies to the instant action. Since the UCSPA was promulgated to redress claims related to claim settlement practices under "insurance policies or contracts," then the UCSPA does not apply to claim settlement practices under "surety contracts" and likewise, does not apply to the instant action. Since the UCSPA does not apply to surety contracts, even assuming that all of the facts alleged in 2H&V's Complaint were true, 2H&V has failed to state a claim for which relief could be granted, and Count IV should be dismissed pursuant to CR 12.02(f). As a result,

International respectfully requests that this court dismiss Count IV of the Plaintiff's Complaint for failure to state of cause of action.

Respectfully submitted,

 /s/ *Keith D. Heath*
THOMAS E. CRAFTON
LEE M. BREWER
KEITH D. HEATH
ALBER CRAFTON, PSC
Hurstbourne Place, Suite 1300
9300 Shelbyville Road
Louisville, KY 40222
Telephone: (502) 815-5000
Facsimile: (502) 815-5005
*Counsel for Defendant*
*International Fidelity Insurance Company*

## CERTIFICATE OF SERVICE

I hereby certify that on the 30th day of September, 2009, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to the following:

Benjamin L. Riddle     briddle@mmlk.com, rmitchell@mmlk.com

John H. Dwyer , Jr.     jdwyer@pzgp.com, belindab@zielkefirm.com

Jon A. Woodall     jwoodall@mmlk.com, sdarr@mmlk.com

Laurence J. Zielke     Lzielke@zielkefirm.com, Jstuart@zielkefirm.com

 /s/ *Keith D. Heath*
KEITH D. HEATH
*Attorney for Defendant,*
*International Fidelity Insurance Company*